# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| TINA DIANE WINDHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 13-0025-WS-N |
| | ) | |
| CITY OF FAIRHOPE, ALABAMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (doc. 71), defendants' Motion for Summary Judgment (doc. 76), and Plaintiff's Motion to Strike (doc. 82). The Motions have been extensively briefed and are now ripe for disposition.

## I.     Nature of the Case.

Plaintiff, Tina Diane Windham, who was initially represented by counsel but is now (at least nominally) proceeding *pro se*, brought this action against the City of Fairhope, Alabama and two of its police officers, Trent Scott and Damien Rehorn.[1] At the outset, Windham's 59-page Complaint interposed nearly two dozen causes of action against defendants, alleging numerous constitutional deprivations under 42 U.S.C. § 1983 and violations of Alabama law. All such claims arise from and relate to her arrest by the City of Fairhope Police Department on January 12, 2012.

---

[1]     Originally, Windham also brought claims against several other defendants; however, none of those claims remain in play. Via Order entered on December 11, 2013, the Court granted plaintiff's request to dismiss all of her claims against defendants Frank Kostyra and Anita Kostyra, and terminated those individuals as parties defendant. (Doc. 48, at 2.) Additionally, an Order entered on February 24, 2014 granted plaintiff's request to dismiss the last of her claims against another defendant, Chief Bill Press. (Doc. 64.) Inasmuch as Windham is no longer pursuing any causes of action against him, the Clerk's Office is directed to **terminate** Bill Press as a party defendant.

Due to a combination of defendants' Rule 12(b)(6) motion and plaintiff's serial requests for voluntary dismissal of certain claims, the number of pending causes of action has been whittled down to nine. Those remaining claims are as follows: (i) Count One (false imprisonment / false arrest against all defendants pursuant to § 1983, alleging that Officers Scott and Rehorn lacked arguable probable cause to arrest her); (ii) Count Two (excessive force against all defendants pursuant to § 1983, alleging that Officers Scott and Rehorn injured her by employing unprovoked "roughhouse actions" to arrest her); (iii) Count Seven (Eighth Amendment excessive bail claim against the City of Fairhope); (iv) Count Eight (Fourteenth Amendment due process claim against the City relating to the conditions of Windham's bail); (v) Count Ten (municipal liability against the City under § 1983 for inadequate training and for an official policy or custom that led to Windham's allegedly false arrest and the alleged use of excessive force); (vi) Count Eleven (municipal liability against the City under state law alleging vicarious liability for the purported misconduct of Officers Scott and Rehorn); (vii) Count Twelve (state-law false imprisonment / false arrest claim against all defendants); (viii) Count Thirteen (state-law excessive force claim against all defendants); and (ix) Count Fourteen (state-law assault and battery claim against all defendants).[2]

Both sides now seek summary judgment on these claims. In summary judgment briefing, Windham wrote, "Plaintiff abandons her counts related to the unfairness and excessiveness of the bond which gave rise to Counts Seven and Eight of her Complaint." (Doc. 81, at 10.) Because Windham has, by her own admission, "expressly abandoned" these claims (*id.* at 9), defendants' Motion for Summary Judgment is **granted** as to Counts Seven and Eight. Those claims are **dismissed**. This Order will address the parties' dueling summary judgment motions as to the § 1983 false imprisonment / false arrest, excessive force, and municipal liability claims, as well as

---

[2]     In her principal brief in support of her Rule 56 Motion, Windham also maintains that she is still pursuing "**Count Five**; (privacy under the rubric of the Fourteenth Amendment); [and] **Count Six;** privacy under the rubric of the Fourteenth Amendment)." (Doc. 72, at 19-20.) This Court dismissed Count Five on defendants' Rule 12(b)(6) motion via Order dated April 16, 2013. (*See* doc. 20, at 35 ("The Motion is **granted** as to … Count V (invasion of privacy as to Officers Scott and Rehorn), and those causes of action are **dismissed**.").) In an Order (doc. 48) entered on December 11, 2013, the Court granted Windham's Motion (doc. 44) to strike/withdraw Count Six. Counts Five and Six have not been a part of this litigation for some time, and plaintiff's contention to the contrary is incorrect.

the state-law claims for municipal liability, false imprisonment / false arrest, excessive force and assault and battery.

## II. Background Facts.[3]

The circumstances culminating in Windham's arrest are clearly depicted in a video recording taken from the officers' patrol vehicle, with accompanying audio from a body microphone worn by one of the officers. (*See* doc. 77, Exh. B.) Neither side disputes the authenticity of the recording, or suggests that it has been doctored or manipulated in any way. The undersigned has carefully reviewed that recording, and accepts its contents for summary judgment purposes notwithstanding any party's contrary or inconsistent statements. *See Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible").[4]

### A. Circumstances Leading to Windham's Arrest.

Shortly before 8:30 a.m. on January 12, 2012, a Fairhope Police Department dispatcher contacted Officers Scott and Rehorn. An audio recording of the dispatch call confirms that the dispatcher stated as follows: "Could you go to 853 North Section, 8-5-3 North Section? Tina Windham is outside hollering about her neighbors again." (Doc. 72, Exh. 6.) The officers

---

[3]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). With respect to defendants' summary judgment motion, then, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[4]     *See also Scott v. Harris*, 550 U.S. 372, 380-81 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *Flowers v. City of Melbourne*, 2014 WL 715609, *3 n.2 (11th Cir. Feb. 26, 2014) ("Where a videotape of an incident discredits one party's version of events, the court must view the acts in the light depicted by the videotape.").

responded, "10-4." (*Id.*)[5] That address is located in a residential area, on a two-way street with at least moderate traffic moving in both northbound and southbound directions. Windham's home was adjacent to the address to which the officers were dispatched.

Minutes later, Officers Scott and Rehorn arrived at that location in their marked police cruiser, with blue lights activated. (Doc. 77, Exh. B.)[6] The car's in-dash camera reflects that the officers arrived to find a white pick-up truck parked along the southbound side of North Section Street, with driver's side tires fully in the roadway. The truck's driver and Tina Windham were standing in the roadway on the driver's side of the vehicle, and Windham was holding what appeared to be a red gasoline container. (*Id.*) As the police cruiser came to a stop behind the pickup truck, the driver entered the truck and closed the door, while Windham remained standing in the roadway speaking to him.

The video reflects the following sequence of events thereafter: Officers Scott and Rehorn, both of whom were in uniform, exited the patrol car and walked over to the truck. Officer Scott called out, "Hey Ms. Windham, how you doin'?" Without acknowledging the officers, Windham stated to the truck's driver, "You're going to be a witness. Don't go anywhere, I just gave you gas." Officer Scott asked her to leave the roadway, but Windham interrupted him, loudly exclaiming, "No, I've got a right to be here." Officer Scott said, "We need to get out of the roadway," in response to which Windham snapped, "You're in the road, I'm not in the road." In fact, she was standing in the southbound lane of traffic. The driver complied with the officers' instructions and moved the white truck completely off the roadway, prompting Windham to exclaim loudly to the driver, "Don't leave. … These people be calling and saying all kind of shit. 'Cause I've had it."

---

[5]    In defendants' summary judgment submissions, they refer to a "CFS Report," documenting the initial call to the Fairhope Police Department as being a complaint that "Tina Windham is outside the residence screaming at car passing by about neighbors." (Doc. 84, Exh. A.) The record does not show, however, that this information was relayed to Officers Scott and Rehorn prior to Windham's arrest. By all appearances, all the officers had to go on when they arrived at the scene was the dispatcher's remark that Windham was "outside hollering about her neighbors again."

[6]    Officer Scott had been employed as a police officer by the City of Fairhope since 2005, and Officer Rehorn was a new hire who was assigned to Officer Scott for in-field training at the time of this incident. (Scott Dep. (doc. 77, Exh. C), at 8, 143.)

Still standing partially in the roadway, Windham waved her finger at Officer Scott from a close distance and said, "I really don't want to talk to you." Windham then fully re-entered the roadway as Officer Scott politely said, "We got called down here for a reason." Speaking in a loud, hostile tone of voice, Windham shouted back, "You get called down here all the time for a reason." Officer Scott said, "You calm down." She screamed back, "You calm down." Officer Scott asked her twice what was going on, and she responded (again in a loud, confrontational voice) that she had given gas to a stranded motorist. Once again, Officer Scott requested that she leave the roadway, and she yelled back, "You get out of the road." Officer Scott again instructed her to calm down, but Windham shouted, "I'm not gonna calm down," although she did finally move to the shoulder of the road. Officer Scott again told Windham, "Ma'am, you need to calm down," to which she responded, "No." He reached for the gas can (which she was still holding), but Windham jerked it away. Officer Scott said, "Hand me that gas can." She refused and exclaimed to the truck driver (who was still seated in his vehicle), "You see what I'm talking about." As Windham continued yelling, Officer Scott (still utilizing a polite, even tone of voice) said, "You just need to calm down. We don't need all this hollering." Windham loudly responded, "I'm not calming down. I don't have to. I'm in my fucking yard." Officer Scott replied, "Yes, ma'am, but you're also in the roadway."[7] When Windham remained agitated and angry, Officer Scott again instructed her to calm down, but she refused. Windham shouted, "You gonna arrest me for giving this man gas?" Officer Scott answered, "I don't want to, absolutely not." Windham then demanded to know why the officers were there. When Officer Scott replied that someone had called the police, Windham demanded to know who. "I don't know," Officer Scott answered. Once again, Officer Scott told her she needed to calm down, which appeared to enrage Windham more as she screamed, "I don't have to calm down." He told her again to calm down and she again refused, saying, "I'm not calming down." Officer Scott then calmly said, "Yes, ma'am, you are going to calm down." He then took the gas can from her, and Windham shouted, "Give me my gas back." Officer Scott's next words were, "You're under arrest." The entire incident, from the time the officers arrived at the scene until

---

[7] In point of fact, Windham was no longer standing in the road when that statement was made; however she had been standing in the roadway just seconds earlier and was still standing on the shoulder, right at the road's edge.

Officer Scott informed Windham that she was under arrest, lasted barely 90 seconds. (Doc. 77, Exh. B.)

During his deposition, Officer Scott explained that, "after [he] was trying to get [her] out of the roadway, [she] had already committed disorderly conduct by obstructing the flow of traffic." (Scott Dep., at 171.) Officer Scott further explained that he "was trying to get the gas can away from [Windham] because of safety concerns for [him]self and others. [She] had already committed disorderly conduct." (*Id.*) Furthermore, Officer Scott elaborated that, with regard to Windham's cursing and belligerence, "if it rises to the level that alarms me or somebody else, then that's when it becomes a crime," and that in his view, Windham's actions could have alarmed "[e]very passing motorist" because she was "very loud." (*Id.* at 174.) Accordingly, Officer Scott testified that he placed Windham under arrest for the offense of disorderly conduct.[8]

---

[8]     In her summary judgment brief, plaintiff takes exception to various aspects of this factual recitation. First, she contends that there is no evidence that "southbound traffic had to veer into northbound traffic to continue traveling." (Doc. 81, at 6.) This objection is meritless. The video plainly shows that, when the officers arrived, Windham was standing in the roadway on the driver's side of the truck, well within the southbound lane of traffic. No vehicle driving southbound on North Section Street could have passed that location without either (i) striking Windham, or (ii) swerving into the oncoming lane of traffic. Second, Windham takes umbrage at Officer Scott's references to "safety concerns" as they relate to the gas can, insisting that he had no such trepidation until he "lawyered up." (Doc. 81, at 7.) But Officer Scott had previously testified back on January 17, 2012 that, as these events took place, Windham was "too close" to him and was "[w]ithin an officer's safety disadvantage." (Doc. 72, Exh. 3, at 12.) And while Officer Rehorn admitted that, prior to her arrest, Windham did not pose a threat to him (doc. 72, Exh. 4, #15), Officer Rehorn was standing further away from Windham than Officer Scott was. At another hearing, Officer Scott referenced Windham's gas can and stated that he did not "know if there was any gas in it or not" because she would not let him handle it, which testimony is fully consistent with his later expression of safety concerns. (Doc. 81, Exh. 2, at 8.) In short, the Court perceives no inconsistency in the evidence that would warrant discrediting Officer Scott's citation of safety as a factor motivating his efforts to get the gas can away from Windham. Third, plaintiff claims it is "patently untrue" that "Officer Scott repeatedly requested Plaintiff to leave the road and she repeatedly refused." (Doc. 81, at 7.) That is <u>exactly</u> what the video recording shows; therefore, the Court credits this fact for summary judgment purposes, notwithstanding plaintiff's objection. Fourth, plaintiff disputes that she was "impeding the flow of traffic" (doc. 81, at 8); however, that is precisely what the video shows. Windham stood in the street and defiantly remained there, even after repeated instructions from Officer Scott that she do so. Any and all southbound traffic on North Section Street would be impeded by her (Continued)

### B. Implementation of the Arrest.

Unfortunately, the video recordings do not clearly show what transpired after Officer Scott placed Windham under arrest. Much of the ensuing chaotic struggle was blocked from the patrol vehicle's dash camera because the officers and Windham were positioned on the other side of the white pick-up truck. And Officer Rehorn's body camera video is shaky from the officer's physical exertion and the camera being jostled; therefore, the video does not fully depict what occurred, and it is necessary to supplement the recording with the parties' deposition testimony and other evidence to obtain a complete picture of the incident. (Doc. 77, Exh. F.)

What is pellucidly clear is that Windham, in her own words, "vigorously resist[ed]" the officers' efforts to take her into custody. (Doc. 81, Exh. 4, at 4.)[9] After being told that she was under arrest, Windham repeatedly screamed, "Call Chief Press," and stated, "I don't give a shit." (Doc. 77, Exhs. B & F.) She yelled for the officers to "break my arm," told them, "y'all are so fuckin' bad," and "I want you to hurt me," and made numerous inflammatory statements such as, "I have fucking had it with you people" and "Call an ambulance, motherfucker." (*Id.*) After being handcuffed, Windham appeared to go limp and drop to the ground, such that Officer Rehorn was forced to move the patrol car up to her location to facilitate her being taken into custody. Windham refused to get in the car, so the officers had to bodily lift her up and push her into the vehicle, even as she struggled and fought and cursed them the entire time.

It took approximately four minutes from the moment that Officer Scott told Windham she was under arrest until the officers were able to subdue her and place her in the police car. Once she was in the vehicle, Windham began kicking at the windows with such violence and force that one of the officers commented, "She's gonna kick that glass out." (Doc. 77, Exh. F.)

---

actions. Although she had moved off the road (albeit just barely) at the moment of her arrest, the fact remains that Windham had stood in the road and refused multiple directives to move.

[9]     Windham elaborated in her affidavit by stating, "I resisted being arrested" and "I refused to cooperate." (Windham Aff. (doc. 72, Exh. 1), ¶ 24.) By her own admission, Windham "just lost it." (*Id.*, ¶ 27.) Windham further concedes that the officers attempted to get her to "walk to get in the car but I wasn't going to assist them putting me in there." (*Id.*, ¶ 29.) Confronted with these circumstances, the officers had no choice but to use force to move her into the back of the police cruiser.

Accordingly, the officers made the decision to place her in leg irons to confine her movement.[10] That activity entailed removing her from the vehicle, placing shackles on her and returning her to the vehicle. Again, Windham cursed and kicked and struggled the entire time. Because of Windham's violent resistance, that process took another approximately two minutes.

In testifying about these events, Officer Scott stated that Windham "assaulted" him by kicking him "in the arms, in the leg, in the chest." (Scott Dep., at 127.) He also explained to Windham during the deposition, "we didn't want to hurt you and we were trying to be as careful as we can and you were being combative." (*Id.*) For her part, Windham testified that the officers "put [her] on the ground" while they were trying to arrest her. (Windham Dep. (doc. 77, Exh. E), at 263). She also testified that she "relaxed and laid on the ground" to resist arrest and that "when we got to the car, I put my feet on the inside of the door … [s]o they couldn't put me in the car." (*Id.* at 271.) Windham stated that she "put [her] feet on the door frame" and "kept [her] legs tight." (*Id.* at 276.) She said the officers finally succeeded in "shoving" her in the car when "[o]ne of them went on the other side, opened the door, and drug me in there and slammed my head in the door." (*Id.* at 277.)[11]

None of the three participants in this altercation emerged physically unscathed. For her part, Windham asserts that when the patrol car door was closed, it hit the top of her head and caused her "neck pain and strain." (Windham Aff. (doc. 72, Exh. 1), ¶ 30.) Windham maintains that "[t]he top of [her] head hurt for a long time," that she had red marks and broken skin on her

---

[10]    According to Officer Scott's testimony, this was done for Windham's own safety. As he testified, "I was afraid that you were going to be kicking my windows out of my patrol car, which could cause injury to yourself, and I did not want that to happen." (Scott Dep., at 153.) "[I]t could damage the vehicle and it could harm you as well, break – glass breaks you could get sliced." (*Id.* at 154.)

[11]    There is no record evidence from which a reasonable fact finder could conclude that the officers intentionally struck Windham's head against the car door. Rather, the record unambiguously establishes that the officers were dealing with an uncooperative, actively resisting arrestee who struggled mightily against their efforts to secure her in the vehicle. To the extent that Windham's head may have made contact with the vehicle door during the struggle, it was simply a collateral result of her own resistance, rather than the product of malevolence, recklessness or gratuitous "roughhouse tactics" by the arresting officers.

arms, and that her knee "was and remain [*sic*] injured." (*Id.*)[12]  Official reports reflected that Officer Rehorn was "kicked" in the "genitals, face and chest" by Windham during the altercation. (Doc. 77, Exh. A at 4, 16.)  And Officer Scott reported that Windham had kicked him in the upper torso region and arms, and that he suffered scratches to both arms. (*Id.* at 4, 11.)  The video recording corroborates the forcefulness of Windham's resistance and the necessity of the officers' use of physical force to restrain, subdue and secure her.

Numerous criminal charges were brought against Windham as a result of the above-described activities, as well as her subsequent conduct in the patrol vehicle en route to, and after arriving at, the police station.[13]  In particular, Windham was charged in the Baldwin County Circuit Court with two counts of assaulting a police officer, in violation of Alabama Code § 13A-6-21(a)(4); one count of disorderly conduct, in violation of Alabama Code § 13A-11-7; one count of criminal mischief, in violation of Alabama Code § 13A-7-21(a)(1); and one count of resisting arrest, in violation of Alabama Code § 13A-10-41. (Doc. 77, Exh. J.)

---

[12]  Defendant urges the Court to strike or otherwise exclude this portion of Windham's Affidavit as "medical testimony of which Plaintiff has no personal knowledge." (Doc. 84, at 7.)  This request / objection is **denied**.  Windham is surely competent to testify about injuries she received in scuffling with the arresting officers and may testify that she experienced "neck pain and strain" after the car door struck her head.

[13]  That conduct included Windham defecating repeatedly in the patrol car and smearing/flinging feces throughout the passenger compartment.  Such conduct featured prominently in the pleadings, the discovery materials, and so on; however, plaintiff now moves this Court to "strike and exclude any reference to any arguments about Plaintiff's defecating and smearing feces inside the police vehicle." (Doc. 82, at 1.)  Defendants oppose the motion because they contend that this evidence is relevant and probative to her state of mind during the arrest, to show her vindictiveness and hostility toward the arresting officers, to be part of the *res gestae* of the subject events, and to demonstrate that Windham was not in fact injured because she was able to contort her body (despite being seated, handcuffed, and shackled in a vehicle) to perform these acts. (*See* doc. 87.)  It is not necessary to explore or dwell on these facts to resolve fully the pending cross-motions for summary judgment; therefore, the Motion to Strike or Disallow (doc. 82) is **moot** because it relates to evidence that need not be considered on Rule 56 review.  The Court need not and will not make a determination at this time whether such evidence is admissible at trial.  If appropriate, plaintiff may renew her motion to exclude in the form of a motion *in limine*.

# III. Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).[14]

Here, both sides have moved for summary judgment on certain of Windham's claims. The law is clear that "[t]he applicable Rule 56 standard is not affected by the filing of cross-

---

[14] In evaluating the pending summary judgment motions, the Court remains cognizant of plaintiff's nominally *pro se* status. "*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). Nonetheless, even *pro se* litigants must comply with procedural rules and court orders. *See, e.g., Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (explaining that "we are to give liberal construction to the pleadings of *pro se* litigants," but that "we nevertheless have required them to conform to procedural rules") (citation omitted); *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) (a *pro se* party "is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure," and may be sanctioned "for failure to comply with court orders"); Local Rule 83.9(b). Despite the leniency afforded *pro se* litigants, this Court may not serve as *de facto* counsel for Windham, rewrite her filings, or articulate arguments for her to help her navigate past defendants' Rule 56 challenges. *See GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998).

motions for summary judgment." *Smith v. Seaport Marine, Inc.*, --- F. Supp.2d ----, 2013 WL 5878965, *3 (S.D. Ala. Nov. 4, 2013) (citations omitted). Indeed, "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). That said, it is also recognized that "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Smith*, 2013 WL 5878965, at *3 (citations omitted). Such is the case here.

## IV. Analysis.

### A. Section 1983 Claim for False Arrest / False Imprisonment.

With respect to Windham's § 1983 false arrest / false imprisonment claim, defendants invoke the defense of qualified immunity. "To even be potentially eligible for summary judgment due to qualified immunity, the official must have been engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004) (citations omitted). Plaintiff cannot reasonably dispute that Officers Scott and Rehorn were acting within the scope of their discretionary authority when they arrested her on January 12, 2012. As such, "[t]o overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* at 1264.

In the context of a Fourth Amendment false arrest claim such as Windham's, the qualified immunity inquiry turns on "arguable probable cause," not actual probable cause. *See, e.g., Wilkerson v. Seymour*, 736 F.3d 974, 977-78 (11th Cir. 2013) ("[a]n officer is entitled to qualified immunity … where the officer had 'arguable probable cause'") (citations omitted); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010) ("If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply."). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010) (citation omitted); *see also Wilkerson*, 736 F.3d at 978 (similar). Of course, probable cause exists when "facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information,

would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (internal quotation marks omitted). "What counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct." *Wilkerson*, 736 F.3d at 978 (citation omitted). On summary judgment, Officers Scott and Rehorn claim entitlement to qualified immunity on Count One because there was arguable probable cause for Windham's arrest.[15]

---

[15]    In a reply brief, plaintiff argues for the first time that "Defendants Should Be Estopped From Asserting That 'Probable Cause' Existed for Plaintiff's Arrest." (Doc. 85, at 5.) Specifically, plaintiff explains that on April 10, 2014, a Baldwin County jury acquitted her of disorderly conduct, the charge for which she was originally arrested. (Doc. 85, Exh. B.) Plaintiff reasons, "Since the jury has rendered a decision on the officers having no 'probable cause' to arrest Plaintiff for a crime, the Defendants should be estopped from claiming the existence of 'probable cause.'" (Doc. 85, at 10.) This argument flirts with frivolity. The Baldwin County jury made no findings concerning the presence or absence of probable cause. It is well-settled that "[t]he facts necessary to establish probable cause need not reach the standard of conclusiveness and probability as the facts necessary to support a conviction." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (citation omitted). A veritable tsunami of authority has held that a jury's finding of not guilty on criminal charges cannot be deemed a conclusive determination that the underlying arrest lacked probable cause. *See, e.g., Restatement (Second) of Torts*, § 667(2) ("The acquittal of the accused by a magistrate or trial court is not evidence of lack of probable cause."); *Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988) ("The fact that plaintiffs had been previously acquitted in the criminal case is far removed from establishing whether probable cause existed for their arrests."); *Mutter v. Sanders*, 611 F. Supp.2d 837, 848 (C.D. Ill. 2009) ("For obvious reasons, however, neither a court's not guilty finding nor a prosecutor's dismissal of a charge means that probable cause is lacking."); *Goddard v. Kelley*, 629 F. Supp.2d 115, 130 (D. Mass. 2009) ("The plaintiff has the burden to prove lack of probable cause; it cannot be merely inferred from the fact of acquittal."); *Kaminske v. Wisconsin Cent. Ltd.*, 102 F. Supp.2d 1066, 1074 (E.D. Wis. 2000) ("Mere acquittal on the criminal charge does not establish a lack of probable cause."); *Ware v. United States*, 971 F. Supp. 1442, 1467 (M.D. Fla. 1997) ("Ware's ultimate acquitted does not rebut or negate the existence of probable cause."); *Delchamps, Inc. v. Bryant*, 738 So.2d 824, 832 (Ala. 1999) ("The mere fact that the plaintiff was acquitted in the prior action does not establish a want of probable cause."); *Brackin v. Reynolds*, 194 So. 876 (Ala. 1940) ("this court seems to be committed to the proposition that the acquittal on final trial of one accused of crime does not tend to show a want of probable cause for believing him guilty of the offense charged"). After all, "[t]he Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted …." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2694-95, 61 L.Ed.2d 433 (1979). As plaintiff's "collateral estoppel" argument suffers from a glaring logical fallacy, it will not be credited.

Taken in the light most favorable to plaintiff, the summary judgment record shows that Officers Scott and Rehorn possessed the following information at the time she was placed under arrest: The officers discovered Windham standing in a roadway holding a gas can. At first, she refused to comply with repeated requests and instructions to get off the roadway, although she eventually did so. Windham was extremely loud, hostile, combative and confrontational from the first moment Officer Scott engaged her with a polite greeting. She defiantly refused at least seven officer requests to calm down, becoming more shrill and agitated at every turn. Among other things, Windham yelled that she was "in [her] fucking yard" and people were "saying all kind of shit," all while standing alongside a public roadway within ready earshot of passing motorists, the officers themselves, the pick-up truck driver, and her neighbor (who was standing nearby watching the disturbance unfold). Windham refused to relinquish the large red gasoline container she was holding, whose contents (if any) the officers could not discern.

The officers arrested Windham for disorderly conduct. By Alabama statute, "[a] person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he or she does any of the following: … (2) Makes unreasonable noise … [or] (5) Obstructs vehicular or pedestrian traffic, or a transportation facility." Ala. Code § 13A-11-7(a)(2), (5). As to the latter point, the officers personally observed Windham standing in the southbound lane, blocking any traffic in that direction, and refusing to leave the roadway when directed to do so by Officer Scott, thereby supporting an inference that Windham was acting with the intent to cause public inconvenience, annoyance or alarm. Those facts certainly give rise to arguable probable cause to arrest Windham for a violation of § 13A-11-7(a)(5).

More fundamentally, the officers had abundant reason to believe that Windham was violating the "unreasonable noise" prong of § 13A-11-7(a). Her speech was extremely loud, hostile and aggressive. She used obscenities. The video recording reveals that she appeared to be screaming at the top of her lungs. In addition to the officers, present on the scene were multiple members of the public, including the stranded driver, Windham's neighbor (to whom she called out during the arrest), and passing motorists. Under the circumstances, it was not unreasonable for the officers to perceive that Windham's conduct (screaming profanities, behaving in an uncontrolled and irrational manner, arguing with police officers on a roadside, and wielding a gasoline container) at least recklessly created a risk of inconvenience, annoyance

or alarm to these persons. As such, the Court readily concludes that the record taken in the light most favorable to Windham establishes arguable probable cause for her arrest.[16]

Numerous analogous authorities applying Alabama law support this conclusion. *See, e.g., Zann v. Whidby*, 904 F. Supp.2d 1229, 1241-42 (N.D. Ala. 2012) (finding that deputy had at least arguable probable cause to arrest plaintiff for disorderly conduct after heated confrontation in parking lot of apartment complex where plaintiff lived); *Hutchins v. City of Alexander City*, 822 So.2d 459, 461-62 (Ala.Crim.App. 2000) (finding *prima facie* case of disorderly conduct established where woman became angry and irate at the front of police station, refused directives to calm down, pointed her finger in officer's face, and screamed obscenity in manner that was audible to others); *Powell v. State*, 796 So.2d 404, 425 (Ala.Crim.App. 1999) ("Because Powell cursed loudly and used abusive language in the presence of several police officers at the police station, the officers had sufficient probable cause to arrest Powell for the misdemeanor offense of disorderly conduct."); *Ivey v. State*, 710 So.2d 946, 947 (Ala.Crim.App. 1998) (finding jury question as to whether appellant committed offense of disorderly conduct where evidence showed that appellant, using abusive language, yelled at next-door neighbor); *Sterling v. State*, 701 So.2d 71, 74-75 (Ala.Crim.App. 1997) (finding ample evidence that defendant committed offense of disorderly conduct where he went to sheriff's office and questioned in loud voice why

---

[16] Windham suggests that the "unreasonable noise" prong of the disorderly conduct statute is or may be unconstitutionally vague. (Doc. 81, at 26.) Plaintiff is wrong. *See Sterling v. State*, 701 So.2d 71, 74 (Ala.Crim.App. 1997) ("Section 13A-11-7, Code of Alabama 1975, which describes the offense of disorderly conduct, is not unconstitutionally vague nor overbroad."); *Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998) ("the Alabama disorderly conduct statute is presumptively valid … and we note that the Alabama disorderly conduct statute has recently been held constitutional by the Alabama courts"). The same goes for Windham's half-baked theory that her arrest violated the First Amendment because "cherished free speech rights were implicated and chilled." (Doc. 81, at 1; doc. 72, at 24.) *See Hutchins v. City of Alexander City*, 822 So.2d 459, 463 (Ala.Crim.App. 2000) (no First Amendment violation where individual was arrested for violating "unreasonable noise" prong of § 13A-11-7, by screaming "don't you fucking tell me what to do" in front of police officers and members of the public, such that restriction on "unreasonable noise" was a proper time, place and manner regulation of speech as applied to her); *Sterling*, 701 So.2d at 75 (arrest of defendant for violating § 13A-11-7(a)(2) did not violate First Amendment because statute's restriction on "unreasonable noise" as applied to his behavior in the hallway of the courthouse, was a proper time, place and manner regulation of speech). Simply put, the First Amendment does not protect unreasonable noise that causes public inconvenience, annoyance or alarm, as the officers reasonably deemed Windham to be doing.

his pistol permit application had been denied, in earshot of other workers, and refused to cease or moderate his tone of voice when instructed to do so); *Rose v. Town of Jackson's Gap*, 952 F. Supp. 757, 764 (M.D. Ala. 1996) (finding arguable probable cause to support arrest for disorderly conduct, where officer was called to scene of domestic dispute and instructed plaintiff to leave the scene, but she refused and argued with third party, calling him obscene name); *Smith v. City of Anniston*, 668 So.2d 96 (Ala.Crim.App. 1995) ("because the appellant made the offensive comment, not only to the police officer, but also in the presence of other individuals who could hear and react, whether his conduct amounted to disorderly conduct was a question of fact for the jury").

In arguing otherwise, plaintiff suggests that it somehow matters that some of her offending conduct occurred on her own property. The law is to the contrary; indeed, even a person on private property can commit the offense of disorderly conduct by causing public inconvenience, annoyance or alarm, such as by screaming, making unreasonable noise, and behaving erratically in one's own front yard, at the edge of a public roadway. *See Rose*, 952 F. Supp. at 764 ("Reasonable law enforcement officers … could have reasonably interpreted Rose's behavior as creating a public inconvenience, annoyance or alarm to neighbors and/or passers-by even while she was on private property."). Contrary to plaintiff's argument on summary judgment, her misconduct transpired in a public place because, regardless of precisely where Windham's feet were planted, her actions and speech could be readily observed and overheard by persons outside of her property. Equally unpersuasive is Windham's argument that the officers did not know with 100% certainty whether other members of the public actually heard her words or whether they found them offensive. After all, "[a]n officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest]." *Powell*, 796 So.2d at 424 (citation omitted); *see also Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010) ("Showing arguable probable cause does not, however, require proving every element of a crime."); *State v. Jemison*, 66 So.3d 832, 842-43 (Ala.Crim.App. 2010) ("the State was not required to present evidence sufficient to sustain a conviction for disorderly conduct in order to render the warrantless arrest lawful").[17] The truck driver and Windham's

---

[17]    Other counterarguments by plaintiff may be easily dispatched. For example, she suggests that the officers improperly arrested her for an alleged misdemeanor that occurred (Continued)

-15-

neighbor were standing close by, and motorists were passing in close proximity to, the disturbance she created via unreasonable noise. That suffices to give rise to arguable probable cause, regardless of whether there was enough evidence to support a conviction.

Again, the inquiry is whether reasonable officers in the same circumstances and with the same knowledge as Officers Scott and Rehorn could have believed that probable cause existed to arrest Windham. On the record facts in the light most favorable to Windham, the Court answers this question affirmatively. Based on her erratic, hostile, loud, and belligerent conduct in a public place (*i.e.*, in a roadway blocking traffic and then on the side of the road), her refusal to comply with seven directives to be calm, her hysterical shrieking at officers who were there for a legitimate law enforcement purpose to investigate a telephonic complaint to the Fairhope Police Department, and her wielding of a gas can that could be viewed as alarming or threatening by the public, Windham gave the officers at least arguable probable cause to arrest her for disorderly conduct.[18] Officers Scott and Rehorn are therefore entitled to qualified immunity on Count One.[19]

---

outside their presence; however, this is a red herring because the Court's "arguable probable cause" analysis focuses exclusively on what the officers observed and on Windham's conduct in their presence. Likewise, plaintiff's attempt to exploit what she perceives as inconsistencies in the officers' subsequent testimony concerning the particular subsection of the disorderly conduct statute they believed she violated is unavailing as a matter of law. *See Wilkerson*, 736 F.3d at 979 ("an arrest may be for a different crime from the one for which probable cause actually exists … but arguable probable cause to arrest for **some offense** must exist in order for officers to assert qualified immunity") (emphasis added); *Durruthy v. Pastor*, 351 F.3d 1080, 1089 n.6 (11th Cir. 2003) ("While Durruthy was charged with violating only Fla. Stat. § 843.02, Pastor is shielded by qualified immunity so long as she had probable cause to arrest Durruthy for *any* offense."). What matters, then, is whether there was arguable probable cause to arrest Windham for <u>any</u> offense, not necessarily the particular subsection(s) that Officer Scott may or may not have had in mind when he placed her under arrest.

[18]      In reaching this conclusion, the Court rejects plaintiff's parsing of the facts in her brief. (*See* doc. 72, at 4-7, 23-26.) Plaintiff argues that her standing in the roadway and so could not form part of the probable cause for her arrest because she was not doing it at the moment when she was arrested. This is incorrect. Of course, the officers were entitled to use the entirety of their observations of Windham's conduct, collectively and in totality, throughout the 90-second encounter in assessing whether there was probable cause to arrest. No principle of law or common sense would restrict their probable-cause determination to what was happening at the exact instant when they informed Windham she was under arrest, yet that is what plaintiff (Continued)

**B.    Section 1983 Claim for Excessive Force.**

In Count Two of the Complaint, Windham brings a § 1983 claim against defendants for using excessive force in connection with her arrest. Defendants move for summary judgment on Count Two on a theory of qualified immunity.[20]

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest … necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (citation omitted). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) (citation omitted). "[I]n determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (citation and

---

argues, in an attempt to minimize her own wrongful, inflammatory, and disruptive conduct throughout the episode.

[19]    Defendants argue at length that they are entitled to summary judgment on Count One for the distinct reason of collateral estoppel. Multiple state court judges have already made a probable cause finding in the context of ongoing criminal proceedings against Windham. On February 13, 2012, a Baldwin County District Judge found sufficient probable cause to submit the charge of disorderly conduct to the grand jury. (Doc. 77, Exh. I.) On December 18, 2012, a Baldwin County Circuit Judge denied Windham's motion to suppress or declare the arrest unlawful. (Doc. 77, Exh. K.) On April 9, 2014, during the jury trial of the disorderly conduct charge, a Baldwin County Circuit Judge ruled as follows: "I'm making a finding, as a matter of law, that it was a lawful arrest because the officers – there is evidence to support that. There's no evidence to the contrary." (Doc. 86, Exh. A, at R-15.) The Court need not address what, if any, preclusive effect these state-court determinations might have on these proceedings because, considering the issue *de novo*, the Court finds that the record establishes arguable probable cause for Windham's arrest, thereby entitling defendants to qualified immunity from suit as to the § 1983 false arrest/false imprisonment claim.

[20]    Once again, there is and can be no dispute that Officers Scott and Rehorn were acting within their discretionary authority in arresting and subduing Windham, and moving her to their police cruiser for transportation to the station. Thus, the burden lies with Windham to establish that these defendants violated a clearly established constitutional right.

footnote omitted). For purposes of the excessive force inquiry, "we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Morton*, 707 F.3d at 1281 (citation omitted). "A law enforcement officer receives qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situation could have believed the use of force was not excessive." *Brown*, 608 F.3d at 738.

Record facts in the light most favorable to plaintiff show that when the officers placed her under arrest, Windham resisted. She struggled against their efforts to handcuff her. She went limp and dropped to the ground, forcing the officers to lift and carry her into the vehicle. As the officers carried her, Windham kicked, struck, scratched and clawed at them. She pried her feet against the door frame of the vehicle to prevent the officers from pushing her inside. Once she was secured in the police car, Windham began violently kicking the windows, such that the officers were obliged to remove her (kicking and screaming all the while) from the vehicle, place leg shackles on her, and return her to the vehicle to prevent her from injuring herself and/or damaging public property. All of these steps – handcuffing her, lifting/carrying her into the police car, removing her from the vehicle, placing leg irons on her, and forcing her back inside – were reasonable and necessary under the circumstances to subdue and secure an actively resistant arrestee. An objectively reasonable officer could conclude that no lesser amount of force would have been adequate to secure Windham in the police cruiser.

A suspect is "not protected against a use of force that is necessary in the situation at hand." *Jean-Baptiste*, 627 F.3d at 821 (citations and internal quotation marks omitted). The use of force against Windham in this case was indeed necessary, entirely because of her own active and vigorous resistance. *See, e.g., Flowers v. City of Melbourne*, 2014 WL 715609, *2 (11th Cir. Feb. 26, 2014) ("[T]he record is clear that Flowers was vigorously resisting the officers' efforts to secure him. … We do not second-guess these decisions where the amount of force applied was not grossly disproportionate to Flowers' resistance," so officers were entitled to qualified immunity); *Harvey v. City of Stuart*, 2008 WL 4605926, *4 (11th Cir. Oct. 17, 2008) (use of force was reasonable where suspect actively resisted arrest and sustained stubbed toes, bruised knee and dislocated finger in the struggle); *Benton v. Hopkins*, 2006 WL 2052858, *2-3 (11th Cir. July 25, 2006) (finding that officers were entitled to qualified immunity on excessive force claim

where suspect refused commands and struggled against handcuffing, such that officers responded by pepper-spraying suspect in eyes and striking him with baton in legs and neck until he complied); *see generally Nolin v. Isbell*, 207 F.3d 1253, 1258 & n.4 (11th Cir. 2000) (finding that officer used no more than *de minimis* force where officer shoved suspect into a vehicle, pushed his knee into the suspect's back and the suspect's head against the van, searched the suspect's groin area in an uncomfortable manner, and handcuffed suspect, causing minor bruising). Besides, the law is clear that, "[f]or even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." *Brown*, 608 F.3d at 740.

The record is devoid of evidence that the officers used more force than necessary to restrain, subdue and secure Windham pursuant to her arrest. They did not punch her, kick her, or utilize any force beyond that which was reasonably required to get her handcuffed, shackled and secured in their cruiser. There was never a moment when Windham became docile and compliant but the officers maliciously or gratuitously continued using force. Rather, the summary judgment record establishes that Officers Scott and Rehorn used only the degree of force that was necessary in the situation at hand. If anything, these officers exercised restraint to refrain from using any more force than required, even as Windham kicked them in the groin, scratched their arms, called them "motherfuckers" and was otherwise assaultive and hostile. In any event, because an objectively reasonable officer in the same situation could have believed the use of force was not excessive, these defendants are entitled to qualified immunity from suit as to Count Two.[21]

---

[21] In summary judgment briefing, Windham adopts a different tack as to her § 1983 excessive force claim. Rather than arguing that the Fourth Amendment required the officers to use less force than they did, Windham argues that the officers had no right to use any force at all because they had no right to arrest her. (Doc. 72, at 26-27; doc. 81, at 28-29.) This theory cannot rescue Count Two. To be sure, the Eleventh Circuit has explained that "if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest." *Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006). But binding Circuit precedent holds that no freestanding excessive force claim may be maintained in such circumstances. *See, e.g., Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) ("Under this Circuit's law, however, a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim."); *Bowens v. Superintendent of Miami South Beach Police Dep't*, 2014 WL 631146, *4 (11th Cir. Feb. 19, 2014) (affirming dismissal of excessive force claim where plaintiff did not contend that amount of force used in effectuating arrest would be unlawful even if arrest were (Continued)

### *C.* *Section 1983 Claim for Municipal Liability.*

In Count Ten of the Complaint, Windham brings a § 1983 claim against the City of Fairhope, alleging that the conduct of Officers Scott and Rehorn "was ordered and/or conducted pursuant to an officially promulgated policy sanctioned or ordered by the Police Department of the City of Fairhope." (Doc. 1, ¶ 157.) The Complaint further predicates liability on what it terms the City's "lack of adequate training designed to prevent unlawful arrests and excessive force during the unlawful arrest." (*Id.*, ¶ 161.) In her Motion for Summary Judgment, Windham elaborates that her § 1983 theory against the City is one of ratification and failure to train. Specifically, Windham argues that the City failed to discipline Officer Scott for his actions with respect to her, and that the City likewise was aware of "prior unlawful policing practices" (doc. 72, at 29) by Officer Scott, yet took no disciplinary action.

As an initial matter, Windham's § 1983 claim against the City of Fairhope fails for want of an underlying constitutional violation. *See, e.g., McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("to impose § 1983 liability on a municipality, a plaintiff must show … that his constitutional rights were violated"); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred"); *Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir. 1993) ("Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise."). The foregoing discussion demonstrates that there are no genuine issues of material fact and that Windham was neither falsely arrested in violation of her Fourth Amendment rights, nor subjected to excessive force in violation of her Fourth Amendment rights.[22]

---

valid, but instead argued only that use of force was unlawful because arrest was unlawful, such that excessive force claim was subsumed in false arrest claim). "When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest." *Bashir*, 445 F.3d at 1332. Windham's formulation of her excessive force claim that the officers had no right to use any force because the arrest itself was unlawful is not an excessive force claim at all, and is therefore due to be dismissed under binding precedent, notwithstanding Windham's stated unhappiness with the Eleventh Circuit rule. (*See* doc. 72, at 27.)

[22]     Of course, in granting defendants' Rule 56 Motion as to Counts One and Two, the Court found that the officers were entitled to qualified immunity, which is not the same as (Continued)

Even if plaintiff could establish a constitutional deprivation relating to her arrest, Count Ten would fail as a matter of law. With respect to her ratification theory, the law is clear that "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of *Monell*." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994) ("A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference toward the police misconduct.") (citation omitted). Similarly, municipal liability on a failure-to-train theory requires "evidence that the municipality was aware of the need to train or supervise its employees in a particular area." *American Federation of Labor and Congress of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1188-89 (11th Cir. 2011) (citations omitted); *see also Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1145 (11th Cir. 2007) ("Skop was required to bring forth some evidence of a pattern of improper training to sustain her claim, and she must show that Atlanta was aware of the deficiencies in the program.") (citations and internal marks omitted).

The trouble is that Windham has no evidence of a widespread practice of false arrests or excessive force at the Fairhope Police Department. To be sure, plaintiff points to four previous complaints that she says lend credence to the existence of pattern of constitutional deprivations by Fairhope police officers; however, the facts do not support her position. In *Lawrence v. City of Fairhope*, the plaintiff complained of false arrest and other deprivations by a Fairhope officer (not Officer Scott) in an incident that occurred in January 2007 (fully five years before Windham's arrest); however, a federal jury exonerated the officer in November 2011. (Doc. 84, Ex. C.) In *Henderson v. City of Fairhope*, the plaintiff complained that Officer Scott had

---

finding that no constitutional violation occurred. But the Court is of the opinion that, on this record, no reasonable fact finder could conclude either that Windham was arrested without probable cause or that constitutionally excessive force was used in connection with that arrest. There being no Fourth Amendment violation attendant to the officers' decision to place Windham under arrest or the manner in which they effectuated that arrest, plaintiff cannot pursue a § 1983 claim for municipal liability because she has no underlying constitutional deprivation on which to bootstrap such a claim.

engaged in excessive force in investigating a traffic accident in May 2009.  No finding of liability was ever made in that case; in fact, the Fairhope Police Department and its then-Chief, Bill Press, investigated the incident and found no use of excessive force by Officer Scott.  (Doc. 84, Exh. I.)  In October 2010, a person named Kayla Hamblin complained to the Fairhope Police Department about Officer Scott for improperly searching her; however, a subsequent internal investigation concluded that his actions were justified, legal and proper.  (Doc. 84, Exh. D, at 3.) Finally, in November 2010, a person named Johnye Parish complained to the Fairhope Police Department that Officer Scott had engaged in unprofessional conduct in a civil matter involving a child custody exchange.  Upon investigation, the Fairhope Police Department found that the Parish complaint was meritless, that Officer Scott had conducted himself in a professional manner, that he properly exercised his discretion, and that he acted in conformity with Alabama law and department policies.  (Doc. 84, Exh. E, at 1-7.)

Taken in the aggregate, then, plaintiff's evidence is that the Fairhope Police Department received four unsubstantiated complaints about its officers in the five years preceding Windham's arrest.  This is not sufficient to establish municipal liability.  "The deprivations that constitute widespread abuse … must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Plaintiff has identified just four episodes over a five-year period; moreover, none of those complaints were found to have merit.  On this record, no reasonable fact finder could conclude that the City of Fairhope was on notice of a widespread pattern of constitutional deprivations by its police force, which it either ratified or failed and refused to provide adequate training to prevent.  Plaintiff identifies no evidence from which the City could have been placed on notice that, as of January 2012, Officer Scott needed training in proper arrest procedures and the use of force.  She points to no deficiencies in the Fairhope Police Department's internal investigation, evaluation and conclusions as to each and every prior instance.[23]  Nor does plaintiff show that it

_____

[23]        To be sure, plaintiff offers a conclusory, blanket accusation that "[i]n each case, Officer Scott either threated [*sic*] to arrest or made an arrest lacking probable cause." (Doc. 72, at 28.)  But where is the evidence from which a reasonable jury could so conclude?  She points to no infirmities in the Fairhope Police Department's investigation of each of these complaints. She cites no facts that would rationally support a conclusion that (i) Officer Scott flouted basic probable cause standards in making arrests in these cases, much less (ii) that the City was on (Continued)

would have been appropriate to discipline Officers Scott and Rehorn for their conduct on January 12, 2012. At that time, uncontroverted evidence shows, they were confronted with a hysterical, non-compliant, overtly hostile individual (Windham) on or near a public roadway (with multiple members of the public nearby) who refused to comply with basic commands, screamed obscenities, obstructed a roadway, carried (and refused to relinquish) a gas canister, rejected at least seven directives to calm down (even as Officer Scott indicated that he did not wish to arrest her), and violently resisted attempts to take her into custody. Notwithstanding these extraordinarily difficult and challenging circumstances -- which were entirely initiated and escalated by Windham -- the videotape unambiguously establishes that the officers conducted themselves in a polite, professional and courteous manner at all times, even as Windham verbally and physically assaulted them.

In sum, then, even if plaintiff had come forward with evidence to support an inference that her constitutional rights were violated, she could not succeed on her claims for municipal liability under § 1983 on a ratification or failure-to-train theory. As for ratification, no reasonable fact finder could conclude on this record that the City of Fairhope should have disciplined Officers Scott and Rehorn for their conduct in the Windham arrest. Nor could a reasonable fact finder conclude from this record that the City knew of a widespread pattern of constitutional misconduct, so as to put it on notice of the need to provide further training to its police officers in areas of false arrest and excessive force.

### D.  *State-Law Claims.*

Plaintiff's remaining claims are all brought under Alabama law. In particular, Count Twelve is a state-law claim of false arrest / false imprisonment, Count Thirteen is a state-law claim of excessive force, Count Fourteen is a state-law assault and battery claim, and Count Eleven is a state-law claim of municipal liability against the City for these purported torts.

As an initial matter, Officers Scott and Rehorn assert that they are entitled to summary judgment on Counts Twelve, Thirteen and Fourteen pursuant to the doctrine of state-agent immunity. Under an Alabama statute, "[e]very peace officer … shall have immunity from tort

---

notice of such a pattern of abuse, when its investigations concluded that each complainant's objections were unfounded.

liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338. Acts performed within an officer's discretionary functions are those "as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Sheth v. Webster*, 145 F.3d 1231, 1239 (11th Cir. 1998) (internal quotation marks omitted). "A defendant initially bears the burden of demonstrating that he was acting in a function that would entitle the agent to immunity." *Brown*, 608 F.3d at 741. If the defendant establishes that it was performing a discretionary function when the alleged wrong occurred, then the plaintiff must "demonstrate that the defendant [ ] acted in bad faith, with malice or willfulness." *Scarbrough v. Myles*, 245 F.3d 1299, 1303 n.9 (11th Cir. 2001) (internal quotation marks omitted).

Plaintiff's half-hearted argument that Officers Scott and Rehorn were not performing a discretionary function when they arrested Windham fails as a matter of law. "Generally, arrests and attempted arrests are classified as discretionary functions." *Borders v. City of Huntsville*, 875 So.2d 1168, 1178 (Ala. 2003); *see also Downing v. City of Dothan*, 59 So.3d 16, 20 (Ala. 2010) (finding "no question" that defendant municipality's "police officers were exercising a discretionary function in deciding whether to arrest Farmer for driving under the influence"); *Morton*, 707 F.3d at 1285 ("In Alabama, a state agent is immune from civil liability for … acts arising from the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons.") (citation and internal quotation marks omitted); *Grider*, 618 F.3d at 1268 ("Police investigations and arrests usually are considered discretionary function[s] within the line and scope of … law enforcement duties for the purposes of discretionary-function immunity.") (citations and internal quotation marks omitted); *Wright v. City of Ozark*, 2014 WL 1320190, *8 (M.D. Ala. Mar. 31, 2014) ("The Defendant officers were acting within their discretionary authority when they arrested Wright."). It cannot seriously be disputed that Officers Scott and Rehorn were engaged in discretionary functions when they decided to arrest Windham and utilized a degree of force to take her into custody.[24] Such decisions obviously fall into the category of law enforcement functions as to

---

[24]    With regard to the use of force during an arrest, Alabama courts have recognized that "officers were engaged in the exercise of a discretionary function … when they made the (Continued)

which there is no hard and fast rule governing conduct, and as to which officers must exercise judgment and choice in determining what is just and proper under the circumstances.[25]

Accordingly, these defendants' eligibility for immunity under § 6-5-338 turns on whether Windham can show that they acted in bad faith, with malice or willfulness. She cannot. With respect to the false arrest / false imprisonment claims, "[t]he Alabama Supreme Court has applied the same 'arguable probable cause' standard utilized in this Court's federal qualified immunity cases for determining whether a city police officer receives state-agent immunity for his role in an arrest." *Brown*, 608 F.3d at 741. Thus, where law-enforcement officers are granted qualified immunity as to federal claims because they had arguable probable cause to make an arrest, those defendants likewise "receive both state-agent and statutory, discretionary-function immunity under § 6-5-338(a) from [plaintiff]'s false arrest claim for the same reasons." *Id.* at 741-42. This Court having already found that the defendant officers had at least arguable probable cause to arrest Windham for disorderly conduct, those officers are entitled to § 6-5-338 immunity under state law for Count Twelve, the parallel state-law claim alleging false arrest and false imprisonment.[26]

---

judgment call on how much force to use and under what circumstances to use it." *Thurmond v. City of Huntsville*, 904 So.2d 314, 326 (Ala.Civ.App. 2004). The same is true here.

[25]     In arguing otherwise, plaintiff insists that Officers Scott and Rehorn were stripped of state-agent immunity under Alabama law because they "violated a departmental rule, a state statute, or the state Constitution …," inasmuch as "Rule 4.1(a)(1)(ii) prohibits arrests for misdemeanors not committed in the officers' presence." (Doc. 81, at 31.) It is an unfair and inaccurate distortion of the record to argue that Windham's arrest was for a "misdemeanor[] not committed in the officers' presence." To the contrary, the arguable probable cause that informed the officers' arrest decision was generated by their personal observations of her disruptive, hostile, confrontational, insulting, and obstructive behavior after they arrived on the scene, all of which was captured by in-dash and body-mounted recording devices. This is simply not a case where law enforcement officers decided to arrest a suspect for a misdemeanor based on conduct that they did not witness.

[26]     In so determining, the Court rejects as unpersuasive plaintiff's contention that the requisite bad faith or malice may be inferred here because the officers "made up bogus facts to justify the arrest of the plaintiff." (Doc. 81, at 30.) Whatever minor variations plaintiff might seize upon between the events recorded on the video and the officers' repeated testimony about those events do not support an inference of malice or bad faith; after all, human memories are not perfect and the officers did not have the luxury of testifying while engaged in frame-by-frame (Continued)

As for her state-law excessive force and assault and battery claims, plaintiff characterizes them both as resting on the purported absence of probable cause for her arrest, rather than the use of improper or gratuitous force in subduing and securing Windham pursuant to a lawful arrest. (Doc. 72, at 31.)  The record containing abundant undisputed evidence of probable cause for Windham's arrest, these state-law claims fail to the extent that they are simply derivative of plaintiff's false arrest / false imprisonment cause of action.  In one brief, plaintiff attempts to decouple her assault and battery claim (Count Fourteen) from her state-law false arrest / false imprisonment claim (Count Twelve) by arguing that "Plaintiff never consented to the pummeling upon her body by two beefy police officers."  (Doc. 81, at 32.)  But the record does not support a reasonable inference that Officers Scott and Rehorn "pummeled" Windham.  As discussed *supra*, there is no evidence that the officers beat a defenseless Windham, or that they used one iota more force than necessary under the circumstances to secure her as she kicked, fought, scratched, clawed and otherwise physically resisted their attempts to cuff her and place her in the squad car. The officers were empowered by Alabama law "to use a reasonable amount of force in making a lawful arrest." *Exford v. City of Montgomery*, 887 F. Supp.2d 1210, 1224 n.7 (M.D. Ala. 2012). Plaintiff has identified no record evidence from which a reasonable fact finder might conclude that Officers Scott and Rehorn acted with malice, willfulness or bad faith in exercising that

---

review of the video.  (Plaintiff acknowledges as much in one of her briefs, wherein she posits that "eye witness testimony … can be highly unreliable" (doc. 72, at 5).  Yet she would hold the officers to a legal standard of perfect recall and would impute malice to any discrepancy from the video.)  Besides, the more fundamental point remains that under any rational viewing of the evidence (and particularly the video evidence), the officers had arguable probable cause to arrest Windham for disorderly conduct and to use reasonable force in securing her.  As such, there is no genuine issue of material fact on the question of bad faith / malice / willfulness that might enable plaintiff to overcome defendants' Rule 56 Motion insofar as it invokes the doctrine of state-agent immunity.  Indeed, the absence of malice or bad faith is underscored by a plain viewing of the video, wherein Officer Scott is at all times polite and respectful to Windham, notwithstanding her stream of shrill, angry invective.  At one point, Officer Scott (again in a polite, conciliatory voice) even reassures Windham that he absolutely does not wish to arrest her. Such conduct is the very antithesis of that which might give rise to a jury question of malice.

power.[27]  The officers are therefore entitled to state-agent immunity on Counts Thirteen and Fourteen.

That leaves Count Eleven, the state-law claim of vicarious municipal liability against the City of Fairhope for the conduct of Officers Scott and Rehorn.  That cause of action may be readily dispatched.  "It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." *Ex parte Dixon*, 55 So.3d 1171, 1179 (Ala. 2010) (citations omitted); *see also Brown*, 608 F.3d at 742 ("In cases such as this where the 'municipal employee' is a law enforcement officer, Alabama's statutory, discretionary-function immunity explicitly extends an officer's immunity to the employing municipality."); *Thurmond v. City of Huntsville*, 904 So.2d 314, 326 (Ala.Civ.App. 2004) ("Our holding with regard to the individual defendants also disposes of the claims against the City of Huntsville because the plain language of § 6-5-338 extends discretionary-function immunity to the municipality."); Ala. Code § 6-5-338(b) ("This section is intended to extend immunity only to peace officers and ***governmental units or agencies*** authorized to appoint peace officers.") (emphasis added).  Because Officers Scott and Rehorn are entitled to state-agent immunity on all of Windham's state-law claims against them, the City of Fairhope is likewise immune under § 6-5-338(b), and is therefore entitled to summary judgment on Count Eleven.

## V. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.    Defendant Chief Bill Press is **terminated** as a party defendant, inasmuch as all claims asserted against him have been dismissed or voluntarily withdrawn;

---

[27]    Indeed, Windham points to no specific act or conduct of the officers that was not reasonably necessary in the context of this particular arrest.  Given her vigorous and violent resistance, the officers reasonably needed to cuff her arms behind her, put her on the ground, shove her into the vehicle, remove her from the vehicle after she attempted to kick out the window glass, subdue her, shackle her, and shove her back into the vehicle, particularly when she assaulted them all the while.  Concepts of bad faith, malice and willfulness have no conceivable application to Officer Scott and Rehorn's use of force in connection with Windham's arrest.

2.       Plaintiff's Motion to Strike (doc. 82) is **moot** because it relates to facts that need not be considered in the context of the pending cross-motions for summary judgment;

3.       Plaintiff's Motion for Partial Summary Judgment (doc. 71) is **denied**;

4.       Defendants' Motion for Summary Judgment (doc. 76) is **granted**;

5.       There being no genuine issues of material fact as to any claim or cause of action asserted herein, plaintiff's claims against all remaining defendants are **dismissed with prejudice**; and

6.       A separate judgment will enter.

DONE and ORDERED this 14th day of May, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE